United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEATHER A. SCHOOK,<br><br>    Plaintiff,<br><br>  v.<br><br>JO ANNE B. BARNHART, Commissioner of Social Security,<br><br>    Defendant.<br>_____ / | No. C 04-05464 WHA<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REMANDING FOR FURTHER PROCEEDINGS** |

## INTRODUCTION

In this social security appeal, the administrative law judge erred in failing to consider or give express reasons for disregarding the proffered third-party testimony. Accordingly, plaintiff's motion for summary judgment is **GRANTED** and defendant's cross-motion for summary judgment is **DENIED**. The case is remanded on a limited issue.

## STATEMENT

**1.   PROCEDURAL HISTORY.**

Plaintiff Heather Schook submitted an application for supplemental security income with a protective filing date of March 5, 2002 (AR 148). Her application alleged that she was unable to work since October 1, 2000, due to advanced degenerative disk disease, depression, anxiety, panic and social phobia (AR 149–66). Her application was denied both initially (AR 96, 98–101) and upon reconsideration (AR 97, 104–08). An administrative hearing was timely

1  requested (AR 109–10). A hearing was scheduled for August 22, 2003, but postponed at
2  plaintiff's request (AR 125–33, 141–47). Irene Lontz was appointed as plaintiff's non-attorney
3  representative (AR 135).

4  On January 14, 2004, plaintiff had a hearing before ALJ Charles D. Reite (AR 27–95).
5  The ALJ rendered his decision on March 8, 2004, finding that plaintiff was not disabled
6  (AR 17–26). Plaintiff requested administrative review (AR 14–16). The Appeals Council
7  acknowledged receipt of a letter from Ms. Lontz dated August 23, 2004 (AR 11, 383–84), but
8  ultimately denied plaintiff's request for review (AR 7–10). Plaintiff filed an action before this
9  Court on December 28, 2004, seeking judicial review pursuant to 42 U.S.C. 405(g). Because
10 one or more parties declined to proceed before a magistrate judge, the action was reassigned on
11 January 27, 2005. The parties now make cross-motions for summary judgment.

   **2.    TESTIMONY AT THE ADMINISTRATIVE HEARING.**

13 At the hearing before the ALJ, plaintiff was thirty-two years old (AR 40, 72).[1] She had
14 her bachelor's degree in psychology from University of Pittsburgh and had also received some
15 vocational training as a motorcycle mechanic (AR 72, 74). She had never been married; she
16 had no children, but owned cats (AR 72, 184). Plaintiff testified that she had most recently
17 worked in February of 2001, doing odd jobs; before that, she had worked in construction,
18 landscaping, as an assistant manager at a pizza place and as a cashier at a department store (AR
19 34–35). This testimony was consistent with the work history report plaintiff had submitted with
20 her application for benefits (AR 170–77).

21 When asked why she stopped working, plaintiff initially responded that it was "just the
22 pain, mostly" (AR 36). On a scale from one to ten, she rated the severity of her pain as ranging
23 between four and seven, if ten was the degree of pain that she imagined would be experienced
24 during childbirth (AR 38). She later testified that her biggest problems were emotional, in that
25 she couldn't stand to be around other people because she felt like everyone was judging her

---

[1] At first, plaintiff testified that she was thirty-three years old, but she later corrected herself (AR 34).

2

1  (AR 52). Plaintiff reported taking various pain medications, including Vicodin, Vioxx, codeine,
2  ibuprofen and acetaminophen (AR 39). Elsewhere in the record, plaintiff also indicated that she
3  had been prescribed Prozac and Effexor for depression as well as Trazodone for insomnia,
4  Clonazepam for anxiety, Migrazone for migraines and Levothroxine for hypothyroidism
5  (AR 43, 49, 53–54, 163, 204–05, 213). Plaintiff had also fractured her right elbow when she
6  fell down a hill; it was expected to heal eventually, although it was taking longer than
7  anticipated (AR 41–42, 60–62). When pressed, plaintiff admitted that she had never had "a
8  specific conversation" with her doctor about whether she was able to work (AR 40).

9       As for daily activities, plaintiff testified that she lived in "the mountains;" she had a
10  room in a house and was living there rent-free (AR 46, 62–64). Her landlady, Jessie, did not
11  help her in any way (AR 66). She had one friend who sometimes helped her with laundry, but
12  she generally took care of herself — *i.e.*, grocery shopping, food preparation and personal
13  hygiene (AR 46, 65–67). Plaintiff testified that she spent most of her day reading, watching
14  TV, playing video games or sleeping (AR 51, 181). Indeed, she indicated that she was only
15  awake for a total of about seven hours each day, possibly because she was taking Trazodone
16  daily to help her sleep (AR 52–53, 181). She also had an old pick-up truck and had driven
17  herself an hour and a half to the hearing (AR 68).

18       Plaintiff testified that she felt the agency physicians had been "very condescending"
19  (AR 50). But with regard to her physical limitations, she agreed that she could probably lift 10
20  to 15 pounds and walk for 10 to 20 minutes (AR 70–71). She said that her doctors had never
21  told her what her limits were, but she had been advised not to overexert herself (AR 71–72).

22       Plaintiff's testimony at the hearing was generally consistent with her responses in
23  questionnaires previously submitted on May 27, 2002 (AR 178–86). Plaintiff's friend Katie
24  Edison also corroborated many of these statements in a third-party questionnaire submitted on
25  May 29, 2002, although seemed to have little direct knowledge of plaintiff's daily habits (AR
26  187–92). Ms. Edison noted that plaintiff was "likeable but intensely believes she is not" and
27  seemed "very unhappy," "negative" and "agonizingly uncomfortable around people" (AR

3

1  190–91). With respect to whether she observed any problems with concentration, she indicated
2  that plaintiff sometimes seemed "very distracted, but that's all" (AR 191).

3  The vocational expert, Robert Raschke, then testified regarding plaintiff's past work,
4  which had mainly been performed at medium or light exertional levels (AR 85–86). The ALJ
5  then posed the following hypothetical: a person of plaintiff's age, education and past relevant
6  work experience; limited to sedentary work; with only occasional stooping, crouching, crawling
7  and kneeling, but no climbing; mild (~15%) limitations on concentration pace and persistence;
8  and mild limitations on social interactions (AR 87). The VE opined that such a person would
9  not be able to do any of plaintiff's past relevant work because none of it had been sedentary, but
10 otherwise there were "literally millions of jobs out there" (AR 87–88). By way of example, the
11 VE suggested jobs in general assembly and non-construction labor, although he indicated he
12 had "about 20 very broad fields" in mind, most of which had a sit-stand option (AR 88–91).

13 When the ALJ modified the hypothetical to include moderate (33%) limitations on
14 social interactions, the VE testified that all of the same jobs would be doable because they were
15 all "task-oriented" and did not require much interaction with others (AR 91–92). But, in
16 response to a third hypothetical that further added moderate limitations on concentration, pace
17 and persistence, he opined that such a person would start to "approach unemployability" (*ibid.*).
18 Ms. Lontz, plaintiff's non-attorney representative, declined to ask any further questions,
19 asserting that the third hypothetical adequately reflected the limitations set forth in the
20 assessments of plaintiff's mental residual functional capacity (AR 92–93).

21  **3.    MEDICAL EVIDENCE.**

22 The medical evidence was summarized in the ALJ's decision (AR 20–21). The ALJ
23 found that plaintiff had "degenerative disk disease at L5–S1, major depressive disorder and
24 social anxiety disorder," but her "right elbow fracture and migraine headaches do not represent
25 severe impairments" (AR 22). The administrative record contains records from Long Valley
26 Health Center and Frank R. Howard Memorial Hospital, as well as evaluations by plaintiff's

4

treating physicians and state agency medical consultants (AR 217–382).[2] This order will now briefly review both plaintiff's self-reported symptoms and the findings of each physician who examined her.

### a. Self-Reports.

Plaintiff's disability report, which was submitted with her application for benefits, indicated that she was unable to work due to advanced degenerative disk disease, depression, anxiety, panic and social phobia (AR 158). She claimed she had been afflicted with these conditions since September 1991, but it did not interfere with her ability to work until roughly October 2000 (*ibid.*). In her reconsideration disability report, plaintiff elaborated that her feelings of self-esteem and self-worth had decreased since her application was filed (AR 195). In addition, she had difficulty leaving the house because she was always exhausted (*ibid.*).

In a letter dated February 28, 2003, plaintiff complained that she felt "belittled, judged, not believed, attacked, and condascended [sic] to" by the state agency physicians, to the point that it "nearly undid years of therapy" (AR 208). She further expressed concern that it would be too difficult, both physically and emotionally for her to "leave the security of [her] home" to attend a hearing (AR 209). In another letter dated May 2003, plaintiff described her frustration in not being able to see her therapist because CMSP (County Medical Services Program, for indigent adults not eligible for Medi-Cal) would not cover mental health expenses (AR 210).

### b. Treating Physicians.

As for her medical records, the evidence demonstrated that she suffered from degenerative disk disease, depression and anxiety. On March 7, 2001, she went to the Willits Chiropractic Clinic, complaining of lower back pain (AR 221–24). On December 10, 2001, x-rays revealed no fractures in the lumbosacral spine and normal intervertebral disk height in all regions except L5–S1 (AR 263). Upon referral by plaintiff's treating physician Dr. Cindy

---

[2] This order does not discuss the medical records relating to plaintiff's mammograms, breast exams or other women's health services.

5

1  Norvell, an MRI was performed on February 8, 2002, revealing advanced L5–S1 degenerative
2  disk disease (AR 226).

3        Records, dated from February 8, 2000 to November 13, 2003, were obtained from Long
4  Valley Health Center (AR 270–310, 335–53, 357–63, 370–82). These included notations that
5  plaintiff was only somewhat responsive to medication and "her regular provider has expressed
6  increasing concern over patient's depressive syndrome" (AR 271–72). "Inability to work" was
7  also noted, but it is unclear whether this was plaintiff's self-report which was merely recorded
8  or the doctor's opinion (AR 272). Although initially plaintiff "lost a fair amt [amount] of
9  weight with [a] radical change to a healthy diet," she was later not "compliant with her diet" or
10 "motivated to exercise or lose weight" (AR 273–77). An entry on May 22, 2003, indicated that
11 her "[h]eadaches have been less intense" and treatment of her thyroid condition was also
12 "[i]nterestingly" helping her become more motivated (AR 336). Yet, on September 25, 2003, it
13 was noted that "her level of function has decreased over this summer again," but plaintiff
14 "declines medications and counseling" because it "[d]oes not seem financially or socially
15 possible for her right now" (AR 377).

16       Dr. Norvell and family nurse practitioner Jane A. Keeley completed forms assessing
17 plaintiff's ability to do work-related activities (AR 364–69). They indicated that plaintiff was
18 extremely limited in her physical abilities. They found plaintiff could only lift less than ten
19 pounds (both occasionally and frequently); could stand or walk less than two hours and sit for
20 less than six hours in an eight-hour work day; and had limitations in pushing and pulling due to
21 her fractured elbow (AR 364–65). With regard to non-exertional limitations, Dr. Novell and
22 Ms. Keeley indicated that plaintiff could never climb, balance, kneel, crouch, crawl or stoop;
23 was limited in reaching, handling and fingering; and could not be exposed to temperature
24 extremes, noise, hazards or fumes (AR 365–67). As for plaintiff's mental limitations, they
25 observed moderate limitations even with simple instructions and marked/extreme limitations
26 with detailed instructions (AR 368). Finally, they indicated that plaintiff had extreme
27 limitations in her ability to interact with others (AR 369).

28

### c. Other Evaluations.

On May 20, 2002, a mental disorder questionnaire form was completed by licensed clinical social worker Mary G. Delaney, whom plaintiff had visited weekly from December 24, 2000, to April 25, 2002 (AR 228–32). Ms. Delaney noted that plaintiff suffered from both anxiety and depression, with a "tendency to withdraw emotionally" (AR 230). In addition, she reported that plaintiff's memory, focus and concentration were "somewhat impaired" by her mood disorders (AR 229).

On July 1, 2002, Dr. David Pong, a state-agency medical consultant rendered an official evaluation of plaintiff's physical residual functional capacity (AR 233–40). His assessment was that plaintiff could lift up to 10 pounds frequently or 20 pounds occasionally (AR 234). In his opinion, plaintiff was completely restricted from climbing, but could occasionally balance, stoop, kneel, crouch or crawl (AR 235). Otherwise, she had no non-exertional limitations (AR 236–37). It was also his view that plaintiff was only "partially credible" because her reported symptoms exceeded the objective medical findings (AR 238).

On August 29, 2002, Dr. Peter Vander Veer conducted a psychiatric evaluation (AR 241–47). He observed that plaintiff was generally alert and her thinking was clear, although her movements were slowed (AR 244). Dr. Vander Veer found this assessment "problematic" because he found her memory "mostly intact" and described her as "clearly intelligent," but "socially isolated" (AR 246). He also hypothesized that her depression was increasing her perception of pain and suggested that plaintiff had "a psychosomatic tendency" (*ibid.*). He concluded that plaintiff could understand and complete simple tasks, but not complex instructions; she could respond appropriately to co-workers and supervisors; she could maintain concentration and pace; and she only showed mild limitations in daily living (*ibid.*).

A psychiatric review was conducted by a DDS physician on September 17, 2002 (AR 251–56). It was noted that plaintiff suffered from major depression and social phobia (AR 252–53). Plaintiff was rated with moderate limitations in activities of daily living, moderate limitations in social functioning and moderate limitations in maintaining concentration,

7

1   persistence or pace (AR 254).  Her mental residual functional capacity was also assessed at this
2   time (AR 257–59).  The DDS physician noted moderate limitations in the following categories:
3   understanding, remembering and carrying out detailed instructions; maintaining attention and
4   concentration for extended periods; working with others without being distracted by them; pace
5   and persistence; interacting with the general public; and accepting instructions or responding
6   appropriately to criticism from supervisors (AR 257–58).

7   Another psychiatric review and mental residual functional capacity assessment was
8   conducted by Dr. Lon Gottshaulk on December 20, 2002 (AR 311–20).  This time, plaintiff was
9   rated with mild limitations in activities of daily living, moderate limitations in social
10  functioning and moderate limitations in maintaining concentration, persistence or pace (AR
11  315).  Moderate limitations were also found in the following categories, in addition to those
12  previously noted:  the ability to get along with co-workers or peers without distracting them or
13  exhibiting behavioral extremes and the ability to set realistic goals or make plans independently
14  of others (AR 318–19).

15  On January 11, 2003, Dr. Man Leung conducted a comprehensive orthopedic evaluation
16  (AR 321–24).  Plaintiff had reported that her pain level ranged from four to ten out of ten,
17  usually hovering between seven and eight (AR 321).  She could only sit for thirty minutes,
18  stand for five minutes or walk for two to three blocks (*ibid.*).  Dr. Leung observed a limited
19  range of motion in her lower back and an abnormal gait (AR 323).  He concluded that plaintiff
20  could be expected to stand, walk or sit for six hours in an eight-hour work day; could lift 10
21  pounds frequently or 20 pounds occasionally; and was limited to occasional bending, stooping
22  or crouching but had no other non-exertional limitations (AR 324).

23  Dr. Leung's findings were consistent with those of Dr. Sandra Clancey who evaluated
24  plaintiff's physical residual functional capacity on January 17, 2003 (AR 325–32).  Dr. Clancey
25  further noted that plaintiff would need to take breaks approximately every 30 minutes to an hour
26  (AR 326).  She also observed that plaintiff had "mild difficulty getting up from a seated
27  position" and an "antalgic gait" — *i.e.*, a posture assumed in order to lessen or avoid pain
28

8

1 (*ibid.*).  She opined that plaintiff's allegations of the severity of her symptoms were consistent
2 with the objective findings (AR 330).

**ANALYSIS**

**1.    LEGAL STANDARD.**

A decision denying disability benefits is disturbed only if it is not supported by substantial evidence or is based on legal error. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  Substantial evidence is "more than a scintilla," but "less than a preponderance." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ibid.* The Court must "review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion." *Andrews*, 53 F.3d at 1039.  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. *Ibid.*

The claimant has the burden of proving disability. *Id.* at 1040.  Disability claims are evaluated using a five-step inquiry.  20 C.F.R. 404.1520.  In the first four steps, the ALJ must determine:  (i) whether the claimant is working, (ii) the medical severity and duration of the claimant's impairment, (iii) whether the disability meets any of those listed in Appendix 1, and (iv) whether the claimant is capable of performing his or her previous job; step five involves a determination of whether the claimant is capable of making an adjustment to other work.  20 C.F.R. 404.1520(a)(4)(i)–(v).  In step five, "the burden shifts to the Secretary to show that the claimant can engage in other types of substantial gainful work that exists in the national economy." *Andrews*, 53 F.3d at 1040.  If the ALJ chooses to use a vocational expert, hypothetical questions asked "must 'set out all of the claimant's impairments.'" *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001)(internal citation omitted).

**2.    THE ALJ'S FIVE-STEP ANALYSIS.**

In his decision, the ALJ found at step one of the sequential evaluation process that plaintiff had not engaged in substantial gainful activity since October 1, 2000, her alleged

9

disability onset date (AR 22). At steps two and three, the ALJ found that plaintiff's degenerative disk disease at L5–S1, major depressive disorder and social anxiety disorder were severe impairments, but did not meet or equal any listed impairment (*ibid.*). For steps four and five, the ALJ determined plaintiff had the residual functional capacity to: perform a range of work at the sedentary exertional level with the need for a sit-stand option; occasionally stoop, crouch, crawl, kneel and climb stairs, but not ladders, ropes and scaffolds; moderate (up to 30%) limitation in social interaction with supervisors, co-workers and the public; and mild (up to 15%) limitation in maintaining concentration, persistence and pace (*ibid.*). Based on the testimony of the VE, the ALJ found at step four that plaintiff could not perform her past relevant work (AR 24). At step five, however, he found plaintiff not disabled because there were a significant number of jobs in the national economy that she could perform (*ibid.*).

Here, plaintiff argues that the ALJ erred in (1) failing to consider the opinion of plaintiff's social worker Ms. Mary Delaney; (2) rejecting the opinions of plaintiff's treating physician Dr. Norvell; and (3) failing to consider claimant's obesity in determining her residual functional capacity.

**3.  THE ALJ DID NOT ERR GIVING THE OPINIONS OF PLAINTIFF'S TREATING PHYSICIAN LESS WEIGHT.**

The Court respects that ALJ is responsible for determining credibility of witnesses at the administrative hearing and resolving conflicts in the medical testimony. Substantial evidence supports the ALJ's conclusion that plaintiff's testimony was not entirely credible. This finding was not challenged on appeal.

Plaintiff, however, argues that the ALJ improperly rejected the opinions of her treating physician Dr. Norvell. The Court disagrees. Plaintiff correctly points out that more weight is generally given to a treating physician's opinion than to the opinion of a non-treating physician because the former "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Nonetheless, the opinion of a treating physician is not "necessarily conclusive as to either a physical condition or the ultimate issue of disability." *Ibid.*

Here, the ALJ gave specific reasons for giving the opinions of plaintiff's treating physician less weight (AR 23). Having discredited plaintiff's subjective testimony, it was not legal error to discredit the opinions of Dr. Norvell and Ms. Keeley, which were primarily based on plaintiff's self-reports. The ALJ noted that the limitations ascribed to plaintiff were inconsistent with prior observations in the Long Valley Health Center records and with claimant's own testimony about her exertional limitations (*ibid.*). For example, as noted above, plaintiff testified at the hearing that she could probably lift 10 to 15 pounds, yet Dr. Novell indicated she could only lift less than 10 pounds (AR 70–71). The ALJ also pointed out that some of the limitations found by Dr. Norvell were based on plaintiff's elbow injury, which had simply not healed yet (AR 23). This order finds that substantial evidence supports his rejection of Dr. Norvell's opinion. Even if the evidence were susceptible to another rational interpretation, the Court would have to uphold the ALJ's decision. *Andrews*, 53 F.3d at 1039.

### 4. THE ALJ DID NOT ERR IN FAILING TO CONSIDER PLAINTIFF'S OBESITY.

Plaintiff also claims that the ALJ improperly failed to consider the effects of obesity on her residual functional capacity. This argument is rejected. *First*, plaintiff never raised obesity as a disabling impairment. *Second*, plaintiff points to no evidence in the record that her claimed impairments were worsened or that she was otherwise functionally limited by her weight. While it is true that she discussed losing weight with her treating physicians, it seemed to be in the context of reducing her cholesterol levels and decreasing her risk of developing a metabolic syndrome with hyperlipidemia or Type II diabetes (AR 274). *Third*, defendant correctly argues that *Celaya v. Halter*, 332 F.3d 1177 (9th Cir. 2003) is inapposite. Whereas in *Celaya*, claimant was *pro se*, here plaintiff had the benefit of non-attorney representative Ms. Lontz' assistance and advocacy (see AR 214–16, 383–84). *Compare Burch v. Barnhart*, 400 F.3d 676, 683–84 (9th Cir. 2005)(finding the ALJ adequately considered the effect of claimant's obesity in his

RFC determination).  *Finally*, to the extent that plaintiff's obesity could have exacerbated her lower back pain, this order points out that the ALJ already gave plaintiff "the benefit of the doubt" by limiting her to work at the sedentary, rather than light, exertional level (AR 22–23).

### 5. THE ALJ ERRED IN FAILING TO CONSIDER OR GIVE EXPRESS REASONS FOR DISREGARDING THIRD-PARTY TESTIMONY.

Plaintiff also argues that the ALJ improperly failed to consider the statements of plaintiff's social worker Ms. Delaney.  The Court agrees and further notes that the ALJ also failed to consider or expressly reject the third-party questionnaire submitted by plaintiff's friend Ms. Edison.

Defendant correctly argues that a social worker is not an acceptable medical source.  20 C.F.R. 416.913(a).  At the very least, however, Ms. Delaney would qualify as a lay witness.  Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he expressly determines to disregard such testimony and gives reasons germane to each witness for doing so.  *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).  While defendant argues that Ms. Delaney's level of contact with plaintiff (*i.e.*, weekly) was too infrequent, this would not mean that her statements are entitled to no weight.  While witnesses who view the claimant on a daily basis are in the best position to make independent observations of the claimant's pain or other symptoms, "the testimony of those who see the claimant less often still carries some weight" and should be considered unless expressly discounted.  *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).  Here, the ALJ erred in not mentioning the third-party testimony of Ms. Delany or Ms. Edison at all.

### 6. FURTHER ADMINISTRATIVE PROCEEDINGS ARE NECESSARY.

"The decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of the court."  *Reddick v. Chater*, 157 F.3d 715, 728 (9th Cir. 1998).  The general rule is that remand for further administrative proceedings "is appropriate if enhancement of the record would be useful."  *Harmon v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  Here, the Court finds that the ALJ may wish to pose further hypotheticals to a

12

vocational expert should consideration of the third-party testimony change any of his conclusions about plaintiff's residual functional capacity. Accordingly, remanding the case for further proceedings, or at least for the ALJ to elaborate his analysis of the foregoing issues, is the most appropriate course of action.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is **GRANTED** and defendant's cross-motion for summary judgment is **DENIED**. Judgment will be entered accordingly.

**IT IS SO ORDERED.**

Dated: June 23, 2005

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE